IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| SUSAN FISHER, Derivatively on Behalf of CELGENE CORPORATION, | ) ) ) | Case No. |
| Plaintiff, | ) ) | |
| v. | ) ) | **REDACTED PUBLIC VERSION** |
| MARK J. ALLES, PETER N. KELLOGG, MICHAEL D. CASEY, JAMES J. LOUGHLIN, ERNEST MARIO, CARRIE S. COX, MICHAEL A. FRIEDMAN, RICHARD W. BARKER, MICHAEL W. BONNEY, JULIA A. HALLER, JOHN H. WEILAND, HANS E. BISHOP, PATRICIA A. HEMINGWAY HALL, ROBERT J. HUGIN, JACQUALYN A. FOUSE, GILLA KAPLAN, | ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants, | ) ) | |
| -and- | ) ) | |
| CELGENE CORPORATION, a Delaware corporation, | ) ) ) | |
| Nominal Defendant. | ) ) ) | DEMAND FOR JURY TRIAL |

**[REDACTED] VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, WASTE OF CORPORATE ASSETS, AND UNJUST ENRICHMENT**

Plaintiff, by her attorneys, submits this Verified Stockholder Derivative Complaint for Breach of Fiduciary Duty, Waste of Corporate Assets, and Unjust Enrichment. Plaintiff alleges the following on information and belief, except as to the allegations specifically pertaining to plaintiff which are based on personal knowledge. This complaint is also based on the investigation of plaintiff's counsel, which included, among other things, a review of documents and other information produced by Celgene Corporation ("Celgene" or the "Company") in response to an inspection demand pursuant to title 8 section 220 of the Delaware General Corporation Law Code (the "Books and Records Production" or the "Section 220 Demand"), a

review of public filings with the U.S. Securities and Exchange Commission ("SEC") and a review of news reports, press releases, and other publicly available sources.

## NATURE AND SUMMARY OF THE ACTION

1.      This is a stockholder derivative action brought by plaintiff, a stockholder of Celgene, on behalf of the Company against certain of its current and former officers and directors.  This action seeks to remedy the Individual Defendants' (as defined herein) violations of law addressed herein, including breach of fiduciary duties, waste of corporate assets, and unjust enrichment that have exposed the Company to hundreds of millions of dollars in liability for violations of state and federal law.

2.      Celgene is a multinational biopharmaceutical company primarily engaged in the discovery, development, and commercialization of therapies designed to treat cancer and other severe conditions.   The Company's two "lead" products—Thalomid®[1] and Revlimid®[2]—generate billions of dollars in sales every year, and have constituted between 71% and 93% of Celgene's total sales since 2006.  Since that time, Celgene has recorded more than $47.2 billion from the combined sales of Thalomid and Revlimid.  In 2017 alone, Revlimid generated $8.3 billion, or 63%, of Celgene's total revenue.

3.      ████████████████████████████████████

████████████████████████████████████████████  ████

---

[1] Thalomid, the branded version of the pharmaceutical thalidomide, is used for the treatment of Erythema Nodosum Leprosum, a complication of Hansen's Disease, commonly known as leprosy.

[2] Revlimid, the branded version of the pharmaceutical lenalidomide, is used for the treatment of Myelodysplastic Syndromes ("MDS") and Multiple Myeloma, disorders caused by poorly formed or dysfunctional blood cells.

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

4.    In order to squeeze more multi-billion dollar years out of these products, Celgene engaged in an extensive and unlawful anticompetitive scheme designed to interfere with competitors' efforts to enter the market and indefinitely delay the release of generic versions of Thalomid and Revlimid.  Specifically, to maintain monopolies over Thalomid and Revlimid, Celgene delayed the onset of generic competition by illegally:  (i) refusing to provide samples of Thalomid and Revlimid to generic manufacturers that are necessary for developing generic versions of these products; (ii) filing baseless Citizen Petitions (as explained herein) with the U.S. Food and Drug Administration ("FDA") and engaging in frivolous litigation against generic competitors to trigger automatic thirty-month stays of FDA approval for generic versions of Thalomid and Revlimid; and (iii) entering into market-allocating, pay-for-delay agreements with certain generic drug companies.  As a result of these anticompetitive practices, to date, no generic manufacturer has been able to bring a generic version of either Thalomid or Revlimid to the market, despite extensive efforts to do so.

5.    Under the Federal Food, Drug, and Cosmetic Act ("FDCA"), drug manufacturers must submit a New Drug Application ("NDA") to the FDA in order to obtain permission to market a new drug. The FDA requires that an NDA submission include specific data related to the safety and effectiveness of the proposed drug, as well as information concerning applicable patents.  Following FDA approval, prescription drugs can receive patent protection which prevents other companies from selling drugs with the same active ingredients until the patent expires.  Generally, the term of a new patent is 20 years from the date on which the application for the patent was filed with the U.S. Patent and Trademark Office ("USPTO").

6.      Under the Hatch-Waxman Act, a generic drug manufacturer can seek FDA approval for a generic version of a branded drug product prior to the expiration of any patents by filing an Abbreviated New Drug Application ("ANDA") and certifying in its ANDA that the patent for the brand name drug is either invalid or will not be infringed upon by the generic manufacturer's proposed product.[3]  Through the ANDA filing, a generic drug maker must demonstrate bioequivalence to the Reference Listed Branded Drug ("RLD") (i.e., the branded drug to which the generic will be bioequivalent).  While ordinarily, a generic manufacturer can obtain the necessary samples of the RLD for bioequivalence testing through normal distribution channels (i.e., a wholesaler) simply by purchasing a sufficient quantity of the drug at market price, a generic manufacturer may not do so for Thalomid and Revlimid because of their severe side effects.

7.      Because both Thalomid and Revlimid have extremely dangerous side effects, including life-threatening birth defects when ingested by pregnant women, these products are heavily regulated by the FDA and access to these drugs is highly restricted.  Based upon the dangers both products present, the FDA conditioned its approval of the drugs for sale in the U.S. on Celgene's establishment of risk management distribution programs, or Risk Evaluation and Mitigation Strategies ("REMS") programs,[4] to ensure the safe and appropriate distribution and use of these pharmaceuticals.  To meet the FDA's requirements for approval, Celgene developed

---

[3] This representation is known as a "Paragraph IV certification."

[4] The FDA can require "REMS" programs for new drug products if it determines that such a program is necessary to "ensure the benefits of the drug outweigh the risks of the drug."  The components of a REMS program often include potential restrictions on distribution of the drug. For example, under some REMS programs, manufacturers may distribute the subject drug only to prescribers and pharmacies enrolled in the particular drug's REMS program.

a restricted distribution program for Thalomid, known as the System for Thalidomide Education and Prescribing Safety ("S.T.E.P.S."),[5] and a similar REMS program for Revlimid called RevAssist.   Under these restricted distribution programs, Revlimid is only available to distributors, pharmacists, and recipient patients enrolled in the Revlimid REMS program and Thalomid is only available to those enrolled in the Thalomid REMS program.

8.      Recognizing that certain REMS programs could be used by branded drug makers to impede generic competition, Congress explicitly stated that such programs were not allowed to be used as a tool to prevent generic competitors from entering the market.  *See* Food Drug and Cosmetic Act §505-1(f)(8) (21 U.S.C. §355-1).   In particular, FDC Act section 505-1(f)(8) states: "No holder of an approved covered application shall use any element to assure safe use required by [FDA] under [FDC Act section 505-1(f)] to block or delay approval of an application under Section 505(b)(2) or to prevent application of such element under [FDC Act section 505-1(i)(1)(B)] to a drug that is the subject of an [ANDA]."

9.      Notwithstanding this prohibition, for more than a decade, Celgene has used its REMS programs as a pretext to prevent generic manufacturers from acquiring necessary samples of these products to conduct bioequivalence testing.  Since 2005, a number of Celgene's generic competitors, including Barr Laboratories ("Barr"), Lannett Company ("Lannett"), Mylan Pharmaceuticals ("Mylan"), Dr. Reddy's Laboratories, Inc. ("Dr. Reddy's"), and Natco Pharma Limited ("Natco") have been requesting samples of Thalomid and Revlimid  for purposes of conducting bioequivalence testing.   Celgene refused each of these requests, stating that to provide samples of these products would violate its REMS programs. ████████████

---

[5] In 2010, S.T.E.P.S. was renamed THALOMID REMS™.

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████ the Company continued to deny the requests.  In so doing, Celgene has unlawfully prevented its competitors from obtaining any of the drug products necessary to conduct the bioequivalence testing required to develop viable generic alternatives.

10.     In the rare circumstance that one of its potential generic competitors did manage to obtain samples of Thalomid or Revlimid, and filed ANDA applications and Paragraph IV certifications, Celgene continued to block the generic drugs from entering the market by filing frivolous patent lawsuits and baseless Citizen Petitions with the FDA.  When a branded drug manufacturer initiates a lawsuit against a generic filer within forty-five days of receiving notification of the Paragraph IV certification, the FDA will not grant final approval of the ANDA until the earlier of: (i) the passage of thirty months; or (ii) a court declares that the patent is invalid or not infringed upon by the generic filer's ANDA.  The resulting litigation between the brand name and generic pharmaceutical manufacturers over the validity of the relevant patents and their infringement delays FDA approval of the ANDA for all would be generic manufacturers.

11.     Celgene has engaged in numerous legal proceedings with generic pharmaceutical manufacturers to prevent potential generic competitors from disrupting Celgene's monopoly. This litigation often ends in settlements with generic pharmaceutical companies in which the generic pharmaceutical company agrees to delay the entry of generic equivalent products into the market.  For example, in December 2015, Celgene and Natco abandoned the adversarial positions they had taken in earlier patent litigation and entered into a settlement whereby Natco

agreed not to bring a generic lenalidomide product to market until March 2022, and even then, can only sell a limited quantity of its generic product.   Accordingly, this settlement allows Celgene to maintain a monopoly on lenalidomide, and charge supracompetitive prices for Revlimid until 2026.

12.     The anticompetitive practices detailed herein delayed the onset of generic competition, reducing consumer choice and inflating prices in violation of federal[6] and state antitrust laws.[7]   In the absence of competition from generic drugs, Celgene has prevented consumers from obtaining the benefits of unimpaired generic competition, causing consumers to overpay hundreds of millions of dollars to purchase Celgene pharmaceuticals.   Indeed by preventing generic entry, Celgene has been able to continuously and substantially increase prices for both Revlimid and Thalomid.   For example, while a one month supply of Revlimid cost approximately $6,195 when Celgene first began marketing Revlimid in 2006, the sample supply now costs more than $16,600.

13.     The Individual Defendants have long been aware that the anticompetitive conduct described herein is unlawful.   In particular, nearly a decade ago, in 2009, the Company received a Civil Investigative Demand ("CID") from the U.S. Federal Trade Commission ("FTC"), seeking documents and other information relating to requests by manufacturers of generic drugs to purchase Revlimid and Thalomid.   In requesting this information, the FTC sought to determine whether Celgene engaged in unfair methods of competition.   Then, in 2010, the State

---

[6] Section 2 of the Sherman Act makes it unlawful for any person to "monopolize, or attempt to monopolize… any part of the trade or commerce among the several States."

[7] *See Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1202 n.11 (9th Cir. 2012) (noting that reduced consumer choice and increased price constitute antitrust injury when caused by anti-competitive practices).

of Connecticut issued Celgene a subpoena referring to the same issues raised by the 2009 CID and the Company received a second CID from the FTC relating to these issues.  Furthermore, ▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮

14.    In addition to these governmental investigations, the wrongdoing complained of herein has spawned a plethora of lawsuits.  While Celgene has settled many of these lawsuits, the Company remains subject to at least two lawsuits over its anticompetitive practices.  First, in April 2014, Mylan filed a lawsuit in the U.S. District Court for the District of New Jersey, alleging that Celgene employed anticompetitive tactics to maintain monopoly power in the market for Thalomid and Revlimid, in violation of federal and state antitrust laws.  Mylan alleged that the Company violated unfair competition laws by refusing to sell samples of Thalomid and Revlimid that are necessary for Mylan to conduct the bioequivalence testing required to submit ANDAs to the FDA for approval to market generic versions of these products. The FTC filed an *amicus curiae* brief in support of Mylan's lawsuit, noting that the 2007 Food and Drug Administration Amendments Act ("FDAAA") was explicitly written to prevent drug manufacturers from using REMS programs to impede generic competition, as Celgene was doing with Thalomid and Revlimid.  In December 2014, the District Court in the *Mylan* action denied the Company's motion to dismiss based on Section 2 of the Sherman Act and with respect to the statute of limitations for Thalomid.  In doing so, the court noted that, "Mylan pled that there is no legitimate business reason for Celgene's actions" and that "Celgene has sold samples of Thalomid and Revlimid at retail and provided it to research organizations, but refuses to sell to

Mylan because of its anticompetitive goals."

15. The Company is also the subject of a federal antitrust class action lawsuit filed in the U.S. District Court for the District of New Jersey on behalf of those who have purchased, or provided reimbursement for the purchase of, Revlimid or Thalomid (the "Antitrust Class Action"). The Antitrust Class Action seeks claims against Celgene in connection with the Company's unlawful exclusion of competition from the market for thalidomide and lenalidomide, including causes of action under Sections 1 and 2 of the Sherman Act and Section 16 of the Clayton Act. In October 2015, the Court in the Antitrust Class Action denied the Company's motion to dismiss. In doing so, the Court found that plaintiff's raised a plausible inference that "Celgene willfully sought to maintain its monopoly in violation of Section 2 of the Sherman Act in order to charge supracompetitive prices, not through business acumen or a superior product, but through a concerted effort to deny potential generic competitors access to the market."

16. Lastly, in 2016, 2017, and 2018, ███████████████████████████ ████████████████████████████████████████████████ the Individual Defendants issued materially misleading Proxy Statements urging stockholders to vote to reelect the directors and approve executive compensation packages, among other things. Providing information concerning the Company's anticompetitive practices would result in stockholders' rejection of the Board and its recommendations. Accordingly, in seeking stockholder votes, each of the Proxy Statements omitted material information concerning, among other things, Celgene's illegal anticompetitive business practices and the Company's inadequate internal controls which facilitated the illegal behavior detailed herein.

17.     As a direct and proximate result of the Individual Defendants' failure to exercise appropriate oversight over Celgene, the Company has suffered and will continue to suffer harm, as alleged herein.  The damages Celgene has sustained include, but are not limited to, the costs and expenses incurred in connection with settlements over the Company's anticompetitive practices, the defense of lawsuits filed against Celgene for violations of state and federal antitrust laws, and costs incurred in complying with the investigations by the FTC and Connecticut Attorney General.  In addition, the Company is likely to incur substantial costs in reimbursing customers that have been harmed by the Celgene's anticompetitive practices.

18.     In light of the above, and as further explained herein, plaintiff now brings this action against the Individual Defendants to repair the harm caused with their faithless actions.

## JURISDICTION AND VENUE

19.     Pursuant to 28 U.S.C. §1331 and section 27 of the Securities Exchange Act of 1934 (the "Exchange Act"), this Court has jurisdiction over the claims asserted herein for violations of Section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder. This Court has supplemental jurisdiction over the remaining claims under 28 U.S.C. §1367.

20.     This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

21.     Venue is proper in this Court in accordance with 28 U.S.C. §1391 because: (i) Celgene maintains its principal place of business in this District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial

portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to Celgene, occurred in this District; and (iv) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

**Plaintiff**

22.     Plaintiff Susan Fisher purchased Celgene stock on April 22, 2014, has continuously been a stockholder since that time, and is a current Celgene stockholder.  Plaintiff served Celgene with an inspection demand pursuant to Title 8 Section 220 of the Delaware General Corporation Law Code, for inspection of certain books and records relating to the foregoing allegations.  A copy of the Section 220 Demand is attached hereto as Exhibit A and incorporated herein by reference.  On April 27, 2018, the parties executed a confidentiality agreement, and Celgene subsequently produced documents responsive to the Section 220 Demand.

**Nominal Defendant**

23.     Nominal Defendant Celgene is a Delaware corporation with principal executive offices located at 86 Morris Avenue, Summit, New Jersey.  Celgene is a biopharmaceutical company that discovers, develops, and commercializes therapies for cancer and other inflammatory diseases using protein homeostasis, immune-oncology, epigenetics, immunology, and neuro-inflammation.  Celgene's primary stage commercial products include REVLIMID, POMALYST®/IMNOVID®, OTEZLA®, ABRAXANE®, VIDAZA®, azacitidine for injection (generic version of VIDAZA®), THALOMID (sold as THALOMID or Thalidomide Celgene®

outside of the U.S.) and IDHIFA®.  As of December 31, 2017, Celgene had approximately 7,467 employees.

**Defendants**

24.    Defendant Mark J. Alles ("Alles") is Celgene's Chief Executive Officer ("CEO") and has been since March 2016, Chairman of the Board and has been since February 2018, and a director and has been since February 2016.  Defendant Alles was also President and Chief Operating Officer ("COO") from August 2014 to February 2016; Executive Vice President and Global Head of Hematology and Oncology from December 2012 to July 2014; Executive Vice President and Chief Commercial Officer from February 2012 to December 2012; President of Japan and Asia Pacific Region from July 2011 to February 2012; President of Americas Region from March 2009 to February 2012; and Vice President of Global Hematology Marketing from April 2004 to March 2009.  ███████████████████████████████████████ ████████████████████████████████████████████    Defendant Alles also negligently violated section 14(a) of the Exchange Act by causing Celgene to make misleading statements in its 2016, 2017, and 2018 Proxy Statements.  Celgene paid defendant Alles the following compensation as an executive:

| Year | Salary | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|------|--------|--------------|---------------|----------------------------------------|------------------------|-------|
| 2017 | $1,266,667 | $5,452,454 | $4,235,469 | $2,144,623 | $16,772 | $13,115,985 |
| 2016 | $1,062,583 | $4,257,765 | $3,164,081 | $3,689,654 | $18,334 | $12,192,417 |
| 2015 | $871,250 | $2,176,127 | $1,405,470 | $3,442,215 | $17,109 | $7,912,171 |
| 2014 | $767,917 | $901,257 | $2,077,620 | $4,278,167 | $21,272 | $8,046,233 |
| 2013 | $666,667 | $1,186,586 | $2,440,484 | $3,188,449 | $20,511 | $7,502,697 |
| 2012 | $641,667 | $1,185,800 | $1,088,350 | $770,988 | $18,285 | $3,705,090 |

25.    Defendant Robert J. Hugin ("Hugin") was Celgene's Executive Chairman of the Board from March 2016 to February 2018; Director from December 2001 to February 2018;

Chairman of the Board from June 2011 to March 2016; CEO from June 2010 to March 2016; President from May 2006 to July 2014; COO from May 2006 to June 2010; and Senior Vice President and Chief Financial Officer ("CFO") from June 1999 to May 2006 ███████████

████████████████████████████████████████████████████████████████

███████████ Defendant Hugin also negligently violated section 14(a) of the Exchange Act by causing Celgene to make misleading statements in its 2016 and 2017 Proxy Statements.  Celgene paid defendant Hugin the following compensation as an executive:

| Year | Salary | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|------|--------|-------------|---------------|----------------------------------------|------------------------|-------|
| 2017 | $1,500,000 | $4,416,517 | $3,617,898 | $2,175,000 | $245,322 | $11,954,737 |
| 2016 | $1,500,000 | $4,257,765 | $4,227,020 | $6,294,053 | $247,399 | $16,526,237 |
| 2015 | $1,483,333 | $5,431,237 | $7,944,888 | $7,370,103 | $243,351 | $22,472,912 |
| 2014 | $1,380,000 | $3,899,980 | $9,614,448 | $9,110,269 | $231,416 | $24,236,113 |
| 2013 | $1,262,500 | $3,554,100 | $8,729,638 | $7,236,693 | $212,854 | $20,995,785 |
| 2012 | $1,158,333 | $2,333,760 | $3,658,941 | $3,229,303 | $193,685 | $10,574,022 |
| 2011 | $1,041,667 | $1,793,400 | $2,935,608 | $2,968,698 | $178,626 | $8,917,999 |
| 2010 | $889,375 | $1,386,686 | $2,332,222 | $2,646,999 | $149,551 | $7,404,833 |
| 2009 | $770,000 | $650,180 | $2,128,713 | $1,682,455 | $135,673 | $5,367,021 |
| 2008 | $733,333 | - | $3,035,862 | $1,571,730 | $126,976 | $5,467,901 |
| 2007 | $675,333 | - | $2,603,028 | $1,699,800 | $115,694 | $5,093,855 |
| 2006 | $606,667 | - | $5,592,865 | $1,470,100 | $108,028 | $7,777,660 |

26.    Defendant Peter N. Kellogg ("Kellogg") is Celgene's Chief Corporate Strategy Officer and has been since July 2018 and Executive Vice President and has been since July 2014. Defendant Kellogg was also Celgene's CFO from August 2014 to August 2018. ███████████

████████████████████████████████████████████████████████████████

███████████ Celgene paid defendant Kellogg the following compensation as an executive:

| Year | Salary | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|------|--------|-------------|---------------|----------------------------------------|------------------------|-------|
| 2017 | $871,250 | $2,522,768 | $2,212,952 | $800,352 | $28,196 | $6,435,518 |

| | | | | | |
|---|---|---|---|---|---|
| 2016 | $845,667 | $2,435,987 | $2,118,031 | $2,707,912 | $29,677 | $8,137,274 |
| 2015 | $820,000 | $2,072,789 | $1,405,470 | $1,383,257 | $24,120 | $5,705,636 |
| 2014 | $400,000 | $5,815,094 | $3,313,252 | $560,000 | $9,098 | $10,097,444 |

27.    Defendant Michael D. Casey ("Casey") is Celgene's Lead Director and has been since June 2007 and a director and has been since August 2002.  Defendant Casey is also Chairman of Celgene's Nominating, Governance, and Compliance Committee ("Compliance Committee") and has been since at least April 2008 and a member of that committee and has been since at least April 2004, and was a member of Celgene's Audit Committee from at least April 2004 to at least April 2006.  ███████████████████████████████

███████████████████████    Defendant Casey also negligently violated section 14(a) of the Exchange Act by causing Celgene to make misleading statements in its 2016, 2017, and 2018 Proxy Statements.  Celgene paid defendant Casey the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | RSU Awards | Option Awards | Total |
|---|---|---|---|---|
| 2017 | $142,500 | $108,936 | $326,534 | $577,970 |
| 2016 | $126,250 | $112,478 | $337,393 | $576,121 |
| 2015 | $142,500 | $112,160 | $351,134 | $605,794 |
| 2014 | $142,500 | $194,700 | $522,499 | $859,699 |
| 2013 | $142,500 | $366,141 | $366,040 | $874,681 |
| 2012 | $142,500 | $197,129 | $162,855 | $502,484 |
| 2011 | $142,500 | $179,769 | $147,784 | $470,053 |
| 2010 | $99,000 | $113,806 | $229,764 | $442,570 |
| 2009 | $96,500 | $92,352 | $251,585 | $440,437 |
| 2008 | $78,000 | $0 | $506,023 | $584,023 |
| 2007 | $66,000 | $0 | $245,885 | $311,885 |
| 2006 | $58,500 | $0 | $412,334 | $470,834 |

28.    Defendant James J. Loughlin ("Loughlin") is a Celgene director and has been since January 2007.  Defendant Loughlin is also Chairman of Celgene's Audit Committee and has been since at least April 2009 and a member of that committee and has been since January 2007.  ███████████████████████████████

███████████████████.  Defendant Loughlin also negligently violated section 14(a) of the Exchange Act by causing Celgene to make misleading statements in its 2016, 2017, and 2018 Proxy Statements.  Celgene paid defendant Loughlin the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | RSU Awards | Option Awards | Total |
|---|---|---|---|---|
| 2017 | $117,500 | $108,936 | $326,534 | $552,970 |
| 2016 | $96,250 | $112,478 | $337,393 | $546,121 |
| 2015 | $117,500 | $112,160 | $351,134 | $580,794 |
| 2014 | $117,500 | $194,700 | $522,499 | $834,699 |
| 2013 | $117,500 | $366,141 | $366,040 | $849,681 |
| 2012 | $117,500 | $197,129 | $162,855 | $477,484 |
| 2011 | $117,500 | $179,769 | $147,784 | $445,053 |
| 2010 | $100,000 | $113,806 | $229,764 | $443,570 |
| 2009 | $97,500 | $92,352 | $251,585 | $441,437 |
| 2008 | $91,000 | $0 | $622,500 | $713,500 |
| 2007 | $37,000 | $0 | $271,972 | $308,972 |

29.    Defendant Ernest Mario ("Mario") is a Celgene director and has been since August 2007.  Defendant Mario is also a member of Celgene's Compliance Committee and has been since August 2007.  ███████████████████

███████████████████  Defendant Mario also negligently violated section 14(a) of the Exchange Act by causing Celgene to make misleading statements in its 2016, 2017, and 2018 Proxy Statements.  Celgene paid defendant Mario the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | RSU Awards | Option Awards | Total |
|---|---|---|---|---|
| 2017 | $112,500 | $108,936 | $326,534 | $547,970 |
| 2016 | $93,750 | $112,478 | $337,393 | $543,621 |
| 2015 | $112,500 | $112,160 | $351,134 | $575,794 |
| 2014 | $112,500 | $194,700 | $522,499 | $829,699 |
| 2013 | $87,500 | $366,141 | $366,040 | $819,681 |
| 2012 | $87,500 | $197,129 | $162,855 | $447,484 |
| 2011 | $87,500 | $179,769 | $147,784 | $415,053 |
| 2010 | $71,000 | $113,806 | $229,764 | $414,570 |
| 2009 | $68,500 | $92,352 | $251,585 | $412,437 |
| 2008 | $65,000 | $0 | $589,249 | $654,249 |
| 2007 | $27,500 | $0 | $91,511 | $119,011 |

30.     Defendant Carrie S. Cox ("Cox") is a Celgene director and has been since December 2009.  Defendant Cox was also a member of Celgene's Audit Committee from at least April 2010 to at least April 2017.  ███████████████████

███████████████████  Defendant Cox also negligently violated section 14(a) of the Exchange Act by causing Celgene to make misleading statements in its 2016, 2017, and 2018 Proxy Statements.  Celgene paid defendant Cox the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | RSU Awards | Option Awards | Total |
|---|---|---|---|---|
| 2017 | $90,000 | $108,936 | $326,534 | $525,470 |
| 2016 | $82,500 | $112,478 | $337,393 | $532,371 |
| 2015 | $90,000 | $112,160 | $351,134 | $553,294 |
| 2014 | $90,000 | $194,700 | $522,499 | $807,199 |
| 2013 | $90,000 | $366,141 | $366,040 | $822,181 |
| 2012 | $90,000 | $197,129 | $162,855 | $449,984 |
| 2011 | $90,000 | $179,769 | $147,784 | $417,553 |
| 2010 | $82,500 | $56,765 | $114,575 | $253,840 |
| 2009 | $15,000 | $0 | $469,528 | $484,528 |

31.     Defendant Michael A. Friedman ("Friedman") is a Celgene director and has been since February 2011.  Defendant Friedman is also a member of Celgene's Compliance Committee and has been since at least May 2011.  ███████████████████

███████████████████  Defendant Friedman also negligently violated section 14(a) of the Exchange Act by causing Celgene to make misleading statements in its 2016, 2017, and 2018 Proxy Statements.   Celgene paid defendant Friedman the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | RSU Awards | Option Awards | Total |
|---|---|---|---|---|
| 2017 | $82,500 | $108,936 | $326,534 | $517,970 |
| 2016 | $78,750 | $112,478 | $337,393 | $528,621 |
| 2015 | $112,500 | $112,160 | $351,134 | $575,794 |
| 2014 | $112,500 | $194,700 | $522,499 | $829,699 |
| 2013 | $82,500 | $366,141 | $366,040 | $814,681 |

| 2012 | $82,500 | $197,129 | $162,855 | $442,484 |
| 2011 | $82,500 | $59,092 | $460,314 | $601,906 |

32.     Defendant Richard W. Barker ("Barker") is a Celgene director and has been since January 2012.  Defendant Barker is also a member of Celgene's Audit Committee and has been since January 2012.  ████ ████ ████ ██ ████ ████ ██ ████ ████████████████████████  Defendant Barker also negligently violated section 14(a) of the Exchange Act by causing Celgene to make misleading statements in its 2016, 2017, and 2018 Proxy Statements.  Celgene paid defendant Barker the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | RSU Awards | Option Awards | Total |
| --- | --- | --- | --- | --- |
| 2017 | $90,000 | $108,936 | $326,534 | $525,470 |
| 2016 | $82,500 | $112,478 | $337,393 | $532,371 |
| 2015 | $120,000 | $112,160 | $351,134 | $583,294 |
| 2014 | $120,000 | $194,700 | $522,499 | $837,199 |
| 2013 | $90,000 | $366,141 | $366,040 | $822,181 |
| 2012 | $90,000 | $197,129 | $561,423 | $848,552 |

33.     Defendant Michael W. Bonney ("Bonney") is a Celgene director and has been since April 2015.  Defendant Bonney is also a member of Celgene's Compliance Committee and has been since at least April 2018, and was also a member of Celgene's Audit Committee from at least April 2015 to April 2017.  ████████████████████████████████████████████.  Defendant Bonney also negligently violated section 14(a) of the Exchange Act by causing Celgene to make misleading statements in its 2016, 2017, and 2018 Proxy Statements.  Celgene paid defendant Bonney the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | RSU Awards | Option Awards | Total |
| --- | --- | --- | --- | --- |
| 2017 | $90,000 | $108,936 | $326,534 | $525,470 |

| | | | | |
|---|---|---|---|---|
| 2016 | $82,500 | $112,478 | $337,393 | $532,371 |
| 2015 | $52,500 | $112,160 | $722,492 | $887,152 |

34.     Defendant Julia A. Haller ("Haller") is a Celgene director and has been since October 2015.  Defendant Haller is also a member of Celgene's Audit Committee and has been since at least December 2015.  ████████████████████

████████████████████     Defendant Haller also negligently violated section 14(a) of the Exchange Act by causing Celgene to make misleading statements in its 2016, 2017, and 2018 Proxy Statements.  Celgene paid defendant Haller the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | RSU Awards | Option Awards | Total |
|---|---|---|---|---|
| 2017 | $90,000 | $108,936 | $326,534 | $525,470 |
| 2016 | $90,000 | $112,478 | $337,393 | $539,871 |
| 2015 | $15,750 | $0 | $393,770 | $409,520 |

35.     Defendant Jacqualyn A. Fouse ("Fouse") was a Celgene Director from February 2016 to June 2017; President and COO from March 2016 to March 2017; President Hematology and Oncology from August 2014 to February 2016; Executive Vice President from February 2012 to July 2014; Chief Accounting Officer from November 2011 to July 2014; CFO from September 2010 to July 2014; and Senior Vice President from September 2010 to February 2012.  ████████████████████

████████████████████     Defendant Fouse also negligently violated section 14(a) of the Exchange Act by causing Celgene to make misleading statements in its 2016 and 2017 Proxy Statements. Celgene paid defendant Fouse the following compensation as a director:

| Year | Salary | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|---|---|---|---|---|---|---|
| 2016 | $941,633 | $2,661,152 | $2,084,723 | $3,222,523 | $109,784 | $9,019,815 |

| 2015 | $845,667 | $2,124,401 | $1,405,470 | $3,679,323 | $18,641 | $8,073,502 |
| 2014 | $803,250 | $901,257 | $2,077,620 | $4,867,123 | $22,238 | $8,671,488 |
| 2013 | $753,333 | $1,059,360 | $2,269,123 | $3,692,296 | $21,829 | $7,795,941 |
| 2012 | $729,167 | $1,018,083 | $1,178,617 | $505,951 | $18,285 | $3,450,103 |
| 2011 | $700,000 | $466,284 | $760,973 | $589,225 | $18,551 | $2,535,033 |
| 2010 | $185,769 | $958,650 | $2,414,357 | $506,621 | $1,000,000 | $5,065,397 |

36.     Defendant Gilla Kaplan ("Kaplan") was a Celgene director from April 1998 to June 2018.  Defendant Kaplan was also a member of Celgene's Audit Committee from at least April 2004 to at least April 2014 and a member of Celgene's Compliance Committee from at least April 2015 to at least April 2017.  ████████████████████████  ████████████████████████████  Defendant Kaplan also negligently violated section 14(a) of the Exchange Act by causing Celgene to make misleading statements in its 2016, 2017, and 2018 Proxy Statements.    Celgene paid defendant Kaplan the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | RSU Awards | Option Awards | Total |
|---|---|---|---|---|
| 2017 | $82,500 | $108,936 | $326,534 | $517,970 |
| 2016 | $78,750 | $112,478 | $337,393 | $528,621 |
| 2015 | $82,500 | $112,160 | $351,134 | $545,794 |
| 2014 | $90,000 | $194,700 | $522,499 | $807,199 |
| 2013 | $90,000 | $366,141 | $366,040 | $822,181 |
| 2012 | $90,000 | $197,129 | $162,855 | $449,984 |
| 2011 | $90,000 | $179,769 | $147,784 | $417,553 |
| 2010 | $75,000 | $113,806 | $229,764 | $418,570 |
| 2009 | $74,000 | $92,352 | $251,585 | $417,937 |
| 2008 | $67,000 | $0 | $506,023 | $573,023 |
| 2007 | $59,500 | $0 | $245,885 | $305,385 |
| 2006 | $49,500 | $0 | $405,269 | $454,769 |

37.     Defendant John H. Weiland ("Weiland") is a Celgene director and has been since February 2018.  ████████████████████████  ████████████████████  Defendant Weiland knowingly or recklessly approved the illegal anticompetitive practices alleged herein.  Defendant Weiland also negligently violated section

14(a) of the Exchange Act by causing Celgene to make misleading statements in its 2018 Proxy Statement.

38.     Defendant Hans E. Bishop ("Bishop") is a Celgene director and has been since April 2018. ██████████████████████████████████████████████████████

██████████████████████ Defendant Bishop also negligently violated section 14(a) of the Exchange Act by causing Celgene to make misleading statements in its 2018 Proxy Statement.

39.     Defendant Patricia A. Hemingway Hall ("Hall") is a Celgene director and has been since April 2018.  Defendant Hall is also a member of Celgene's Audit Committee and has been since at least April 2018. ████████████████████████████████████

██████████████████████████████ Defendant Hall also negligently violated section 14(a) of the Exchange Act by causing Celgene to make misleading statements in its 2018 Proxy Statement.

40.     The defendants identified in ¶¶24-26 are referred to herein as the "Officer Defendants."  The defendants identified in ¶¶24-25, 27-39 are referred to herein as the "Director Defendants."  The defendants identified in ¶¶27-28, 30, 32-34, 36-37, 39 are referred to herein as the "Audit Committee Defendants."   The defendants identified in ¶¶27, 29, 31, 33, 36 are referred to herein as the "Compliance Committee Defendants."   Collectively, the defendants identified in ¶¶24-39 are referred to herein as the "Individual Defendants."

## <u>DUTIES OF THE INDIVIDUAL DEFENDANTS</u>

**Fiduciary Duties**

41.     By reason of their positions as officers and directors of Celgene, each of the Individual Defendants owed and owe Celgene and its stockholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control

and manage Celgene in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Celgene and not in furtherance of their personal interest or benefit.

42. To discharge their duties, the officers and directors of Celgene were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of Celgene were required to, among other things:

(a) ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations;

(b) ensure that the Company complied with its legal obligations and requirements—including requirements involving anticompetitive behavior—and refrain from engaging in deceptive conduct;

(c) ensure processes were in place for maintaining the integrity and reputation of the Company and reinforcing a culture of ethics, compliance, and appropriate risk management;

(d) conduct the affairs of the Company in an efficient, business-like manner in compliance with all applicable laws, rules, and regulations so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock; and

(e) remain informed as to how Celgene conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make a reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws.

**Additional Duties Under the Company's Code of Business Conduct and Ethics**

43. Under the Company's Code of Business Conduct and Ethics ("Code of Ethics"), directors and employees must comply fully with all federal and state laws applicable to the Company's business, and with applicable Company policies. The Individual Defendants owe and/or owed specific additional duties to Celgene under the Company's Code of Ethics. Among other things, the Code of Ethics sets out specific guidelines to be observed by all employees concerning Celgene's competition. In particular, the Code of Ethics states:

**Key Principles:**

We must follow the antitrust and competition laws in places where we do business. These laws are designed to preserve a fair and level playing field for all businesses by prohibiting any agreements and practices that improperly restrain business competition. Violations of antitrust and competition laws carry severe penalties that can be imposed on both Celgene and Celgene employees and contractors.

**Celgene in Action:**

Antitrust and competition laws are often complex and vary country to country. If you have any questions regarding antitrust and competition laws, contact the Legal Department immediately. You must not engage in making agreements or arrangements with competitors regarding: • pricing, bid rigging or dividing or allocating markets, territories or customers; or • activities to boycott our customers or suppliers.

**Additional Duties of the Audit Committee Defendants**

44. Under the Celgene Board's Audit Committee Charter, the Audit Committee Defendants, defendants Barker, Bonney, Casey, Cox, Haller, Hayes, Hall, Kaplan, Loughlin, and Weiland, owe and/or owed specific additional duties to Celgene. According to the Audit Committee Charter, among other things, the Audit Committee is responsible for assisting the Board in overseeing the integrity of the Company's financial statements, the Company's compliance with legal and regulatory requirements, and the Company's internal accounting and financial controls. With respect to legal compliance, the Audit Committee Charter provides:

Legal Compliance

- On at least an annual basis, review with the Company's legal counsel, Internal Audit Executive, Chief Compliance Officer, other members of management and/or independent auditors, as applicable, (i) any legal matters, including inquiries received from regulators or governmental agencies, that could have a significant impact on the Company's financial statements, and (ii) the Company's financial compliance (including financial reporting and the requirements of the U.S. Foreign Corrupt Practices Act).

- Obtain assurance from the independent auditor that illegal acts per Section 10A (b) of the Exchange Act have been appropriately addressed.

45. In addition, the Audit Committee Charter provides that one of the primary responsibilities of the Audit Committee is to "[m]onitor the integrity of the Company's financial reporting processes and systems of internal controls relating thereto." In overseeing the Company's financial reporting process on behalf of the Board, the Audit Committee is tasked with the following functions:

Review and Assessment of Internal Controls

- Discuss with management the Company's major financial risk exposures and the steps management has taken to monitor and control such exposures, including the Company's risk management and risk assessment policies.

- Review management's annual Internal Control Report which (I) acknowledges management's responsibility for establishing and maintaining an adequate internal control structure and procedures for financial reporting; and (ii) contains an assessment, as of the end of the most recent fiscal year, of the internal control structure and procedures for financial reporting.

- Establish and maintain procedures for the (i) receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls and auditing matters, and (ii) confidential, anonymous submission by employees of the Company of concerns regarding questionable accounting or auditing matters.

- Consider and review with the independent auditor (i) the adequacy of the internal controls of the Company and its subsidiaries, including computerized information system controls and security; and related findings and recommendations of the independent auditor together with management's responses.

- Coordinate the Board's oversight of the Company's internal control over financial reporting, disclosure controls and procedures and Financial Officer Code of Ethics. Receive and review the reports of the Chief Executive Officer and the Chief Financial Officer required by Rule 13a-14 of the Exchange Act.

- Confirm that the Chief Executive Officer and Chief Financial Officer certificates to be filed under Section 302 of Sarbanes Oxley Act are complete.

**Additional Duties of the Compliance Committee Defendants**

46.     Under the Celgene Board's Compliance Committee Charter, the Compliance Committee Defendants, defendants Bonney, Casey, Friedman, Kaplan, and Mario, owe and/or owed specific additional duties to Celgene.  According to the Compliance Committee Charter, among other things, the Compliance Committee is responsible for "[o]verseeing the periodic evaluation of the performance of the Board and its committees" and "[d]eveloping and recommending to the Board such corporate governance guidelines, including changes to such guidelines that the Committee deems appropriate."   The Compliance Committee is also responsible for "[o]verseeing the Company's corporate compliance efforts."

**Breaches of Duties**

47.     The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of Celgene, the absence of good faith on their part, and a reckless disregard for their duties to the Company that the Individual Defendants were aware or reckless in not being aware posed a risk of serious injury to Celgene. The conduct of the Individual Defendants, who were also officers and/or directors of the Company, has been ratified by the remaining Individual Defendants who collectively comprised the entirety of Celgene's Board during the time of the misconduct.

48.     The Individual Defendants breached their duties of loyalty and good faith by allowing defendants to cause, or by themselves causing, Celgene to engage in widespread

improper practices that wasted Celgene's assets, and caused the Company to incur substantial damage.  The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal actions.  In addition, as a result of the Individual Defendants' improper course of conduct, the Company is now the subject of a number of lawsuits filed in various state and federal courts.  The Company is now the subject of: (i) the Antitrust Class Action, which alleged violations of federal antitrust laws; and (ii) one private action, which alleged violations of federal and state competition laws.  Furthermore, the Individual Defendants' improper conduct has also spawned an investigation by the FTC and the Connecticut Attorney General.  As a result, Celgene has expended, and will continue to expend, significant sums of money.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

49.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

50.     During all times relevant hereto, the Individual Defendants, collectively and individually, initiated a course of conduct that was designed to and did: (i) deceive the investing public, including stockholders of Celgene, regarding the Individual Defendants' management of Celgene's operations; (ii) exploit customers by causing them to pay higher prices to treat the dangerous conditions (leprosy and multiple myeloma) that Thalomid and Revlimid address; and (iii) enhance the Individual Defendants' executive and directorial positions at Celgene and the profits, power, and prestige that the Individual Defendants enjoyed as a result of holding these positions.  In furtherance of this plan, conspiracy, and course of conduct, the Individual

Defendants, collectively and individually, took the actions set forth herein.

51. The Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct. During this time, the Individual Defendants caused the Company to engage in a variety of anticompetitive business practices that resulted in the unlawful exclusion of competition from the markets for thalidomide and lenalidomide.

52. The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duties, waste of corporate assets, and unjust enrichment; and to conceal adverse information concerning the Company's operations, financial condition, and future business prospects.

53. The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing Celgene to purposefully or recklessly engage in the illegal anticompetitive conduct detailed herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

54. Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## REGULATORY FRAMEWORK

55.     Pharmaceutical manufacturers seeking to market a pioneer drug must obtain the FDA's approval by filing an NDA.   21 U.S.C. §355(a).   Among other things, an NDA must contain information pertaining to the composition of the proposed drug product, including its active ingredient, the safety and effectiveness of the drug, as well as any information on applicable patents. 21 U.S.C. §355(a), (b).   For each patent, the NDA must list:

> [T]he patent number and the expiration date of any patent which claims the drug for which the applicant submitted the [NDA] or which claims a method of using such drug and with respect to which a claim of patent infringement could reasonably be asserted if a person not licensed by the owner engaged in the manufacture, use, or sale of the drug.[8]

The manufacturer is required to list these patents in the "Approved Drug Products and Therapeutic Equivalence Evaluations," known as the "Orange Book," which is published by the FDA.   The manufacturer must also list any patent it obtains subsequently thereafter that covers the drug, and do so within thirty days after the patent is issued. 21 U.S.C. §355(b)(1), (c)(2); 21 C.F.R. §314.53(c)(2)(ii).

56.     In 1984, to expedite the entry of generic competitors and reduce healthcare expenses nationwide, Congress enacted the Hatch-Waxman Act.   The Hatch-Waxman Act simplified the regulatory hurdles for prospective generic drug manufacturers by eliminating the need to file lengthy and costly NDAs.  *See* Drug Price Competition and Patent Term Restoration Act, Pub. L. No. 98-417, 98 Stat. 1585 (1984).   A manufacturer seeking approval to sell a generic version of a brand drug may instead file an ANDA demonstrating that its generic version is the "bioequivalent."   While an ANDA applicant is entitled to rely on the pioneer manufacturer's research and data, and is not required to conduct its own tests to prove a drug's

---

[8] 21 C.F.R. §314.53(b).

efficacy and safety, an ANDA applicant must show that the generic drug:  (i) contains the same active ingredient(s), dosage form, route of administration, and strength as the brand drug; and (ii) is absorbed at the same rate and to the same extent as the brand drug—that is, that the generic drug is pharmaceutically equivalent and bioequivalent to the brand-name drug.

57.     In order to perform the necessary bioequivalence testing to obtain FDA approval, a generic manufacturer needs to obtain samples of the branded product.  For most drugs, a generic manufacturer can obtain adequate amounts of the branded product for bioequivalence testing through normal distribution channels, such as through a wholesaler, simply by purchasing a sufficient quantity of the drug at market price.  However, some branded drugs are not available through traditional means because they are associated with potential safety risks.  In particular, the FDA can require a REMS program for a new drug product if it determines that such a program is necessary to "ensure the benefits of the drug outweigh the risks of the drug."  The components of a REMS program often include potential restrictions on distribution of the drug. For example, under some REMS programs, manufacturers may distribute the subject drug only to prescribers and pharmacies enrolled in the particular drug's REMS program.

58.     Recognizing that certain REMS programs could be used by branded drug makers to impede generic competition, Congress made clear that REMS provisions may not be used as a tool to keep generic competitors out of the market.  In particular, FDC Act section 505-1(f)(8) states: "No holder of an approved covered application shall use any element to assure safe use required by [FDA] under [FDC Act section 505-1(f)] to block or delay approval of an application under Section 505(b)(2) or to prevent application of such element under [FDC Act section 505-1(i)(1)(B)] to a drug that is the subject of an [ANDA]."  The FDA has further recognized that REMS programs should not be used to prevent generic manufacturers from obtaining necessary

samples to conduct bioequivalence testing.

59.     Once an ANDA applicant has determined that its generic pharmaceutical is bioequivalent to the brand-name drug, the applicant must submit a certification for each patent covering the pioneer drug listed in the Orange Book representing that either: (1) no patent information was filed with the FDA covering the pioneer drug; (2) the listed patent expired; (3) the patent will expire on a certain date and that the ANDA's approval should be delayed until then; or (4) the patent "is invalid or will not be infringed by the manufacture, use, or sale of the new drug for which the application is submitted." 21 U.S.C. §355(j)(2)(B)(vii).   The fourth representation is referred to as a Paragraph IV Certification.   When filing a Paragraph IV Certification, an ANDA applicant must notify the patent holder, generally the brand name manufacturer.   21 U.S.C. §355(j)(2)(B).

60.     A brand name manufacturer may delay FDA approval of an ANDA by instituting a patent infringement action within forty-five days of receiving notice of an ANDA applicant's Paragraph IV Certification.   If an infringement action is initiated within that forty-five day period, approval is stayed for thirty months or until resolution of the lawsuit.   21 U.S.C. §355(j)(5)(B)(iii). In this regard, the mere act of filing a Paragraph IV Certification constitutes patent infringement allowing the patent holder to immediately file suit against the ANDA applicant. 21 U.S.C. §271(e)(2)(A).

### BACKGROUND ON THALOMID AND REVLIMID

61.     Celgene is a multinational biopharmaceutical company primarily engaged in the discovery, development, and commercialization of therapies designed to treat cancer and other severe conditions.   The Company's two "lead" products—Thalomid and Revlimid—generate billions of dollars in sales every year, and have constituted between 71% and 93% of Celgene's total revenues for the past three years.   Since 2006, Celgene has recorded more than $47.2 billion from the combined sales of Thalomid and Revlimid.

A.      **Thalomid**

62.      The drug thalidomide was originally marketed and used in the 1950s and 1960s by pregnant women as a sleeping pill and to treat morning sickness. However, when used by pregnant women, thalidomide resulted in life-threatening fetal deformities and birth defects as well as other dangerous adverse side effects, such as peripheral neuropathy, which can lead to permanent nerve damage.  As a result of thalidomide's disastrous effects, the drug was banned worldwide, including in the U.S.

63.      In 1998, thalidomide was again approved for usage, when the FDA approved Celgene's Thalomid as a treatment for erythema nodosum leprosum, a form of leprosy. However, to prevent dangerous fetal exposure to the drug, the FDA conditioned its approval upon Celgene's implementation of a REMS restricted distribution program. Celgene's distributors, pharmacists, and all recipient patients of Thalomid are required to enroll in this program.  Because they are not enrolled in the REMS programs for Thalomid, generic manufacturers seeking sample quantities of the drug for bioequivalence testing must obtain samples directly from Celgene.

64.      Until 2007, Thalomid was the Company's flagship product, and generated a majority of the Company's revenue.  In 2005, for example, with net sales over $387 million, Thalomid generated over 72% of the Company's revenues.

65.      As of the date of the filing of this complaint, no generic manufacturer has brought a generic version of Thalomid to the market.  Because Celgene experiences no competition in the market for Thalomid, the Company has been able to consistently increase its prices for the product.  In fact, since Thalomid first received FDA approval, the price has skyrocketed from approximately $6 per capsule to between $212 and $357 per capsule in 2014.

**B.     Revlimid**

66.     In December 2005, Celgene received approval from the FDA to market lenalidomide under the brand name Revlimid.  Revlimid, commonly used to treat multiple myeloma and MDS, is a thalidomide analogue, and presents many of the same dangerous side effects as Thalomid, particularly in pregnant women.  As a result, it is also subject to a REMS distribution program, and is only available to prescribers and pharmacies enrolled in the Revlimid REMS program.  Accordingly, as with Thalomid, generic companies requiring Revlimid samples to conduct bioequivalence testing must obtain Revlimid from Celgene.

67.     Since Revlimid first received FDA approval, Celgene has consistently increased its price.  When Celgene began marketing Revlimid to treat multiple myeloma in 2006, the price was $6,195 for a one month supply of 21 capsules.  By 2010, Celgene had increased the price of Revlimid to approximately $8,000 per month, and by March of 2017, the price had reached $16,691.[9]  As with Thalomid, the Company's ability to charge supracompetitive prices for Revlimid resulted from the lack of lower-priced generic competition.

68.     In addition, for over a decade Revlimid has been Celgene's primary revenue generating product.  In fact, since 2007, Revlimid has accounted for at least 50% of the Company's revenues each year. ████████████████████ ████████████████████████████████ ████████████████ The medication brought in nearly $8.2 billion in 2017, a significant increase from the $7 billion it generated in 2016.

---

[9]     https://www.npr.org/sections/health-shots/2018/05/17/571986468/how-a-drugmaker-gamed-the-system-to-keep-generic-competition-away.

## CELGENE ENGAGED IN AN ANTICOMPETITIVE SCHEME TO PREVENT GENERIC ALTERNATIVES TO THALOMID AND REVLIMID FROM ENTERING THE MARKETPLACE

69.     In order to delay the onset of generic competition and reap supracompetitive profits from its lead pharmaceuticals—Thalomid and Revlimid—beyond their FDA granted periods of exclusivity,[10] Celgene engaged in a multi-faceted anticompetitive scheme designed to interfere with competitors' efforts to enter the market with generic versions of these products. The Company's scheme included:  (i) manipulating its REMS programs' distribution restrictions to delay and indefinitely postpone the availability of cost-saving generic alternatives to Thalomid and Revlimid; (ii) entering into exclusive supply contracts to interfere with potential competitors' ability to market a generic version of Thalomid; (iii) preventing generic entrants from entering the market by improperly obtaining patents on the procedures to ensure safe use of Thalomid and Revlimid; (iv) engaging in sham litigation against generic drug manufacturers that have submitted Thalomid or Revlimid ANDAs to the FDA; and (v) entering into a market allocating settlement agreement with Natco.

70.     The effect of Celgene's anticompetitive practices is that, to date, no generic manufacturer has been able to bring a generic version of either Thalomid or Revlimid to the market.

### A.      The Company Unlawfully Used REMS Programs to Deny Generic Drug Manufacturers' Requests for Revlimid and Thalomid

71.     For more than two decades, Celgene has refused to provide generic drug manufacturers with samples of Revlimid and Thalomid for bioequivalence testing.   As a

_____

[10] Upon approval of a branded manufacturer's new drug, the FDA grants exclusive marketing rights to the branded manufacturer for a certain period of time.  This, period of "exclusivity," prevents the submission or effective approval of ANDAs for generally four to seven years from the time a branded manufacturer receives NDA approval.

justification for its refusal, the Company stated that to do so would violate its REMS programs.

72.     Celgene's refusal to provide samples to generic competitors based on safety concerns is, however, a mere anticompetitive pretext.  The FDA has specifically advised Celgene that providing these samples to certain generic manufacturers for bioequivalence testing would not violate its REMS programs, ████████████████████████████████

████████████████████████████████ Further, Celgene has frequently allowed non-competitor research organizations to access Thalomid and Revlimid samples for the purpose of conducting clinical studies using the drugs.

### 1. Celgene Refused to Sell Samples of Revlimid and Thalomid to Mylan Despite Receiving FDA Approval to Do so

73.     Beginning in October 2004, Mylan sought to obtain samples of Thalomid from Celgene in order to complete bioequivalency studies and submit an ANDA seeking FDA approval of a generic version of Celgene's Thalomid drug product.   On October 5, 2004, through a third party, Mylan sent a letter to Celgene requesting to purchase Thalomid capsules in order to conduct bioequivalence studies.  When Celgene ignored the request, Mylan sent another request on May 3, 2005.  On June 21, 2005, Celgene denied Mylan's request for samples, stating that its Thalomid restricted distribution program required the tracking of all Thalomid distributions, and that it was against policy to deal with third parties in the provision of Thalomid.

74.     On September 2, 2005, Mylan directly contacted Celgene, and requested to purchase Thalomid capsules in order to conduct bioequivalence testing.  Mylan stated that the "FDA had recommended that we contact you directly to request a sample" of Thalomid for bioequivalence testing, and explained that "obtaining samples through other traditional channels is nearly impossible."

75.     In a response dated October 20, 2005, Celgene stated that it needed extra time to consider granting Mylan's request in order to comply with its restricted distribution program and "to avoid fetal exposure."

76.     Two months later, on December 19, 2005, Celgene provided a follow up response, stating that the Company would need the FDA's agreement in order for Mylan to purchase samples outside the S.T.E.P.S. program:  "[W]e recommend that you contact the FDA's [Division of Special Pathogen and Transplant Products] to discuss the importance of the S.T.E.P.S. program to them."  Celgene further stated that if the FDA subsequently "contacts us in writing and recommends that we violate our S.T.E.P.S. program by providing you with the quantity of THALOMID you request, we will further evaluate your request at that time."

77.     In accordance with Celgene's instructions, Mylan coordinated with the FDA to obtain approval for its intended thalidomide sample purchases.  Mylan submitted a letter to the FDA dated January 11, 2006, seeking its assistance in obtaining the samples of Thalomid, and detailing Mylan's proposed restricted distribution protocols for the samples.  The FDA's response dated February 12, 2007, requested an Investigational New Drug Application ("IND") from Mylan to "ensure that all appropriate safeguards for a clinical investigation with thalidomide are in place," as a substitute for the S.T.E.P.S. program.  The FDA's letter further stated that it was not the FDA's intention "to permit the restrictions of the S.T.E.P.S. program to prevent manufacturers of generic drugs from obtaining Thalomid for use in the bioequivalence testing necessary to obtain approval of an abbreviated new drug application for a thalidomide product."  The FDA letter stated:

> It is the FDA's view that certain restrictions are needed to ensure safe use of the drug; *however, it is not the agency's intention to permit the restrictions of the S.T.E.P.S. program to prevent manufacturers of generic drugs from obtaining Thalomid for use in the bioequivalence testing necessary to obtain approval of*

***an abbreviated new drug application for a thalidomide product.*** The agency believes that such bioequivalence studies can be conducted safely under either an IND or in circumstances that provide alternative assurance of patient safety. ***To ensure that the intention of Congress in enacting the generic drug approval provisions in section 505(j) is not frustrated by the terms of the S.T.E.P.S. program, FDA has notified Celgene that the agency intends to exercise its enforcement discretion to permit Celgene to provide to another drug manufacturer (or its agent) 500 units of Thalomid (including 200 units for the purpose of conducting bioequivalence (including dissolution) testing and 300 units for a limited number of retained samples)*** when Celgene has received confirmation in writing from the sponsor, its agent, or FDA that the sponsor of the study either has an IND in effect for the study or has otherwise provided the agency with sufficient assurance that the bioequivalence study will be conducted in such a manner as to ensure the safety of the subjects.

78.     On September 11, 2007, the FDA informed Mylan that the FDA's Division of Bioequivalence had deemed Mylan's proposed thalidomide bioequivalence testing safety protocols "acceptable," and on November 16, 2007 Mylan notified Celgene that the FDA had approved its proposed safety protocols.

79.     Although its alleged safety concerns should have been alleviated by the receipt of the FDA's approval of Mylan's proposed safety protocols, Celgene continued to refuse Mylan's requests for thalidomide samples.  Celgene responded to each of Mylan's repeated requests for thalidomide samples over the next three years with further delaying tactics.  For example, rather than send the requested samples, Celgene would respond to Mylan with requests seeking overly burdensome, irrelevant, and duplicative information.

80.     Celgene's response to Mylan's attempts to obtain lenalidomide samples for purposes of developing a generic form of Revlimid was no different.  In fact, since 2009 the Company has engaged in the same delaying tactics, and has continued to refuse to provide Mylan with the requested samples, even after the FDA approved Mylan's lenalidomide bioequivalence testing safety protocols ████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████     ████████████████

████████████████████████████████████████     ████████

████████████████████████████████████████     ████████

██████████████████

## 2. Celgene Refused to Sell Samples of Thalomid to Lannett Despite Receiving FDA Approval to Do so

81.     Similarly, in 2007, Celgene refused to provide thalidomide samples to Lannett, even after the FDA provided Celgene with express permission to do so.  In a February 12, 2007 letter from the FDA's Office of Generic Drugs ("OGD"), the OGD informed Lannett that it had given Celgene permission to provide 500 units of Thalomid to Lannett for the purpose of conducting bioequivalence testing.  The OGD letter noted that it was not the FDA's intention "to permit the restrictions of the S.T.E.P.S. program to prevent manufacturers of generic drugs from obtaining Thalomid for use in the bioequivalence testing necessary to obtain approval of an abbreviated new drug application for a thalidomide product."  The OGD letter stated:

> To ensure that the intention of Congress in enacting the Generic Drug Approval Provisions in Section 505(i) is not frustrated by the terms of the S.T.E.P.S. program, FDA has notified Celgene that the agency intends to exercise its enforcement discretion to permit Celgene to provide to another drug manufacturer (or its agent) 500 units of Thalomid … for the purpose of conducting bioequivalence testing.

82.     After receiving the FDA's approval to obtain the desired samples, in a letter dated July 26, 2007, Lannett requested to order 250 Thalomid capsules from Celgene for the purpose of conducting bioequivalence testing.  In late September 2007, Lannett provided Celgene with a copy of the FDA letter authorizing Lannett to acquire Thalomid samples from Celgene.  Nonetheless, Celgene refused to provide Lannett with the requested samples.

83.     In light of Celgene's staunch refusal to provide thalidomide samples, in January 2008 Lannett filed a lawsuit against Celgene seeking an order compelling the Company to provide Lannett with the thalidomide samples it was authorized to receive pursuant to the February 12, 2007 OGD letter.   The lawsuit resulted in a confidential settlement and Lannett ultimately submitted a thalidomide ANDA in 2014.   However, as discussed below, Celgene has blocked Lannett's generic thalidomide product from entering the market by filing a frivolous patent infringement lawsuit against Lannett.   The Company's lawsuit against Lannett is pending.

### 3.  Celgene Refused to Sell Samples of Revlimid to Dr. Reddy's Despite Receiving FDA Approval to Do so

84.     Celgene also prevented the pharmaceutical company Dr. Reddy's from bringing a generic lenalidomide product to market by denying Dr. Reddy's access to Revlimid samples.   In August 2008 and January 2009, Dr. Reddy's requested samples of Revlimid from Celgene for the purpose of performing bioequivalence testing.   After ignoring Dr. Reddy's first request, the Company responded to Dr. Reddy's second request with a single sentence:   "Celgene has no obligation to supply Dr. Reddy's with Revlimid and declines to do so."

### 4.  Celgene Provided Revlimid and Thalomid to Companies for Non-Competitive Research Purposes

85.     Celgene's purported justification for its refusal to provide samples of Revlimid and Thalomid to generic drug manufacturers—that doing so would violate its REMS programs for these medications—is undermined by Celgene's dealings with non-competitors.   In particular, despite refusing to provide samples of these products to generic competitors due to apparent safety concerns, the Company has provided Revlimid and Thalomid to various research institutions and universities for noncompetitive research purposes.   For example, Celgene has provided Revlimid to the University Hospital of Toulouse, the Mayo Clinic, Groupe

Francophone Des Myelodysplasies, and the National Cancer Institute.  The Company also provided Thalomid samples to the Johns Hopkins University School of Medicine to conduct noncompetitive clinical trials.  Celgene's provision of Revlimid and Thalomid samples to researchers for noncompetitive purposes undermines the Company's argument that providing such samples to generic drug manufacturers would violate Celgene's REMS programs.

**B.      The Company Entered into an Exclusive Supply Contract with Seratec S.A.R.L. to Prevent Barr Laboratories from Developing a Generic Version of Thalomid**

86.      While few generic pharmaceutical manufacturers are able to obtain samples of thalidomide and lenalidomide containing the Active Pharmaceutical Ingredient ("API") essential for bioequivalence studies that ANDAs require, in or around 2004, Barr Laboratories ("Barr"), a generic pharmaceutical manufacturer, obtained quantities of thalidomide API from a French company called Seratec S.A.R.L. ("Seratec").  Barr used this thalidomide API to begin developing a generic Thalomid product.

87.      By September 2005, Barr had completed its bioequivalency testing, and requested a Drug Master File[11] ("DMF") reference letter from Seratec to include with its ANDA.  Seratec refused to provide a DMF reference letter, explaining that it had entered into an exclusive thalidomide API supply agreement with Celgene, under which Seratec was only permitted to sell thalidomide API to Celgene.  After entering into this exclusive supply agreement with Celgene, Seratec refused to supply Barr with additional quantities of thalidomide API or provide Barr with a DMF reference letter.

---

[11] A drug master file is a confidential document provided to the FDA by active pharmaceutical ingredient manufacturers. These documents detail information regarding the chemistry, manufacturing, and controls used to create active pharmaceutical ingredients.

88.     Celgene's exclusive supply contract with Seratec prevented Barr from filing its ANDA.  Barr had to obtain a new supply of thalidomide API from a different supplier and conduct additional bioequivalence and validation tests for its generic Thalomid product using the new supply of thalidomide API.  This redundant process unnecessarily delayed the filing of Barr's ANDA.

### C.    Celgene Filed Sham Lawsuits Against Generic Drug Manufacturers to Preserve Its Monopoly over the Revlimid and Thalomid Markets

89.     Despite Celgene's anticompetitive tactics, in some rare circumstances, generic pharmaceutical manufacturers have been able to procure Revlimid and Thalomid samples for bioequivalence testing and submit ANDAs for generic versions of these products.  However, by filing patent infringement lawsuits against companies that submitted ANDAs to the FDA, Celgene delayed and prevented FDA approval of these ANDAs.  Since 2010, Celgene has filed a dozen patent infringement lawsuits relating to Revlimid patents against generic competitors, including Barr, Lannett, Dr. Reddy's and Natco.

90.     Between 2008 and 2016, Barr, Lannett, Dr. Reddy's, and Natco each submitted ANDAs for generic versions of Revlimid and/or Thalomid.  After these companies submitted ANDAs, Celgene filed lawsuits against each company alleging that they infringed Celgene's patents for Revlimid and Thalomid.  Barr, Lannett, Dr. Reddy's, and Natco each denied these allegations, arguing that Celgene's patents for Revlimid and Thalomid were invalid.

91.     Celgene's patent infringement suits against Barr, Lannett, Dr. Reddy's, and Natco allowed Celgene to further delay the onset of generic competition for Thalomid and Revlimid. In particular, Celgene's filing of its patent infringement suits triggered automatic stays, under 21 U.S.C. §355(j)(5)(B)(iii), that prevented Barr, Lannett, Dr. Reddy's, and Natco from receiving FDA approval for their generic medications for at least thirty months.

### 1.    Celgene Filed a Sham Lawsuit and Citizen Petition Against Barr

92.    Although Celgene's exclusive dealing arrangement with Seratec prevented Barr from filing an ANDA for Thalomid in 2005, in 2006, Barr obtained enough Thalomid from an alternative supplier to support an ANDA application, which Barr filed in September 2006.  In paragraph IV of Barr's application, it alleged that Celgene's patents were invalid.

93.    After Barr filed its ANDA application, in 2007, Celgene filed a patent infringement lawsuit against Barr, and in September 2008, Celgene filed a Citizen Petition with the FDA asking the agency not to approve a generic version of Thalomid, due to purported safety concerns regarding the drug.  In response, Barr filed counterclaims against Celgene, alleging monopolization, conspiracy to monopolize, and anticompetitive acts, including frivolous litigation.

94.    The filing of Celgene's patent lawsuit delayed and indefinitely postponed Barr's introduction of a generic thalidomide product.  Since Celgene initiated the lawsuit within forty-five days of receiving notification of the Paragraph IV certification, the Company's lawsuit resulted in a thirty-month stay of FDA approval for Barr's generic thalidomide pharmaceutical. During the pendency of the lawsuit-induced stay, Barr withdrew its ANDA for generic thalidomide and in May 2010 Barr and Celgene announced that they had resolved the patent litigation as well as the antitrust counterclaims.[12]  While the details of the settlement have not been disclosed, as of the date of the filing of this complaint, Barr has not brought a generic version of Thalomid to the market.

### 2.    Celgene Filed a Sham Lawsuit Against Natco

95.    On or around September 24, 2010, Natco filed an ANDA with the FDA seeking

---

[12] As a result of the settlement, Celgene's Citizen Petition against Barr became moot.

approval for a generic version of Revlimid.  In response, Celgene filed a patent infringement suit against Natco on October 8, 2010.  Over the next three years, Celgene caused additional patents to be listed in the Orange Book in connection with Revlimid.   On May 6, 2013, Celgene filed its Fifth Amended Complaint against Natco alleging that Natco's generic Revlimid product would infringe a number of Celgene's patents.  Natco's counterclaims asserted that Celgene's patents are invalid or unenforceable and alleged fraud on the USPTO.

96.     While Celgene and Natco agreed to settle the case and dismiss all claims and counterclaims in December 2015, as of now Natco has not brought a generic version of Revlimid to market, and cannot currently market a generic Revlimid product.  As explained below, under the terms of the settlement, Natco is prohibited from bringing a generic Revlimid product to market until at least March 2022, and even then, Natco's sales will be significantly restricted.

### 3.     Celgene Filed a Sham Lawsuit Against Lannett

97.     Similarly, in early 2015, after Lannett filed an ANDA with the FDA seeking approval to market a generic version of Thalomid, and alleged in its Paragraph IV certifications that Celgene's patents were invalid, the Company filed a patent lawsuit against Lannett in the U.S. District Court for the District of New Jersey in early 2015.[13]   In response, Lannett filed counterclaims, accusing Celgene of monopolization, conspiracy to monopolize, and anticompetitive acts, including sham litigation.

98.     As it had with Barr, Celgene's patent lawsuit against Lannett triggered a thirty-month stay of FDA approval for Lannett's generic thalidomide product. *See* 21 U.S.C. §355(j)(5)(B)(iii).  While the thirty-month stay recently ended, the case is pending, and as of the date of the filing of this complaint, Lannett has not brought a generic version of Thalomid to

---

[13] *See Celgene Corp. v. Lannett Holdings, Inc.*, 2:15-cv-00697 (D.N.J.) (Wigenton, J.).

market.

### 4. Celgene Filed a Sham Lawsuit Against Dr. Reddy's

99.     Celgene also initiated patent litigation against Dr. Reddy's in 2016 after Dr.

Reddy's filed an ANDA seeking to manufacture and market a generic lenalidomide product.

Celgene argued that Dr. Reddy's proposed generic Revlimid product infringed seven of its

patents.   In response, Dr. Reddy's filed counterclaims against Celgene seeking a declaratory

judgment concerning the validity of Celgene's patents.   As it had with Barr and Lannett,

Celgene's patent lawsuit against Dr. Reddy's triggered a thirty-month stay of FDA approval for

Dr. Reddy's' generic lenalidomide product. *See* 21 U.S.C. §355(j)(5)(B)(iii).

100.    In April 2018, the Company filed another complaint in the U.S. District Court for

the District of New Jersey alleging that Dr. Reddy's proposed generic version of Revlimid

infringed five more of its patents.[14]   Celgene's patent infringement case against Dr. Reddy's is

pending as of the date of this filing.   Accordingly, Dr. Reddy's generic Revlimid product is still

subject to the thirty-month automatic stay.

### D. Celgene Entered into an Anticompetitive Market-Allocating Settlement Agreement with Natco

101.    In a press release issued on December 22, 2015, Celgene and Natco announced

that they had abandoned the adversarial positions they had taken in the previously discussed

patent litigation and entered into a volume-limited generic settlement for Celgene's flagship

product, Revlimid.   The settlement agreement further delayed and prevented the onset of generic

competition for Revlimid.

---

[14] *Celgene Corporation v. Dr. Reddy's Laboratories, Ltd*. (D.N.J., No. 2:18-cv-06378, Complaint filed April 12, 2018).

102.    Celgene and Natco's settlement agreement is a market-allocating, pay-for-delay agreement that allows Celgene to prolong its Revlimid monopoly.   Under the terms of the agreement, Natco is prohibited from bringing a generic lenalidomide pharmaceutical to the market until March 2022.   But, even then, Natco will only be allowed to sell a restricted amount of the generic product.   According to Celgene's press release, "[t]he volume limit is expected to be a mid-single-digit percentage of the total lenalidomide capsules dispensed in the United States during the first full year of entry."[15]   Although the volume of generic lenalidomide Natco will be permitted to sell will increase slightly each year, Natco will not be allowed to sell unlimited quantities of the product until January 31, 2026.   Since the patent rights for Revlimid expire in April 2027, the settlement agreement essentially preserves Celgene's monopoly over the Revlimid market until the Company's patent rights for the medication expire.

███████████████████████████████████████████████████
████████████████████████████████████████████

### A.    Governmental Investigations and Litigation Concerning the Sale of Samples of Celgene's Products Alerted the Individual Defendants to the Company's Unlawful Anticompetitive Practices

103.    The Individual Defendants have long been aware that the anticompetitive practices detailed herein are unlawful.   As an initial matter, the FDA has issued a number of letters to Celgene confirming that it may sell Thalomid and Revlimid to particular generic manufacturers, including, among others, Lannett and Mylan, for purposes of conducing bioequivalence testing, without violating its REMS programs.   Furthermore, ███████████

███████████████████████████████████████████████████
███████████████████████████████████████████████████

---

[15] Analysts estimate that Natco will be able to sell only around 5-7% of total capsules dispensed.



104.     Celgene's failure to comply with regulatory requirements has subjected the Company to a number of governmental investigations over the past two decades. ▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

In the Company's Annual Report on Form 10-K filed with the SEC on March 1, 2011 (the "2010 Form 10-K"), defendants Hugin, Fouse, Casey, Cox, Friedman, Kaplan, Loughlin, and Mario acknowledged these investigations.  Nonetheless, Celgene continued to deny generic manufacturers' access to Thalomid and Revlimid.

105.     Then, in April 2014, Mylan filed a lawsuit in the U.S. District Court for the District of New Jersey, alleging that Celgene employed anticompetitive tactics to maintain monopoly power in the market for Thalomid and Revlimid, in violation of federal and state antitrust laws.  Mylan alleged that the Company violated unfair competition laws by refusing to

sell samples of Thalomid and Revlimid that are necessary for Mylan to conduct the bioequivalence testing required to submit ANDAs to the FDA for approval to market generic versions of these products.  The FTC filed an *amicus curiae* brief in support of Mylan's lawsuit, noting that the FDAAA was explicitly written to prevent drug manufacturers from using REMS programs to impede generic competition, as Celgene was doing with Thalomid and Revlimid.

**B.**



106.

107.



108.

109.     ████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████  In December 2015, Celgene and Natco abandoned their adversarial positions they had taken in earlier patent litigation and entered into a settlement whereby Natco agreed not to bring a generic lenalidomide product to the market until March 2022, and even then, can only sell a limited quantity of its generic product.  This settlement allows Celgene to maintain a monopoly on lenalidomide, and charge supracompetitive prices for Revlimid until 2026.  ███████████████████████████

████████████████████████████████████████████  ██

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████  ██    ██████  ████  ████  ████    ██████  ████  ████

████████

110.     ████  ██  ████  ████  ████  ██  ████  ██████  ████  ██

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████



## THE INDIVIDUAL DEFENDANTS NEGLIGENTLY MADE MISLEADING STATEMENTS IN CELGENE'S PROXY STATEMENTS

### A.     The 2016 Proxy Statement

111.    On April 28, 2016, Celgene issued its Proxy Statement for the 2016 Annual Meeting of Stockholders, held on June 15, 2016 (the "2016 Proxy"). In the 2016 Proxy, defendants Hugin, Alles, Barker, Bonney, Casey, Cox, Fouse, Friedman, Haller, Kaplan, Loughlin, and Mario solicited stockholder votes to, among other things: (i) reelect themselves to the Board; and (ii) approve an amendment to the 2008 Stock Incentive Plan.  Defendants Hugin, Alles, Barker, Bonney, Casey, Cox, Fouse, Friedman, Haller, Kaplan, Loughlin, and Mario negligently issued misleading statements with respect to each of these solicited votes.

112.    Plaintiff's allegations with respect to the misleading statements in the 2016 Proxy are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of these defendants, and they do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

1.    **Misstatements Made in Support of Reelecting Defendants Hugin, Alles, Barker, Bonney, Casey, Cox, Fouse, Friedman, Haller, Kaplan, Loughlin, and Mario**

113.    In the 2016 Proxy, defendants Hugin, Alles, Barker, Bonney, Casey, Cox, Fouse, Friedman, Haller, Kaplan, Loughlin, and Mario solicited stockholder votes to reelect themselves to the Board.  In support of their bid to reelect themselves, these defendants highlighted their supposed successful oversight of the Company.   In particular, the 2016 Proxy assured stockholders that "the Board of Directors, including through the Audit Committee, Nominating Committee and Compensation Committee, periodically assesses the significant risks that [Celgene] faces," including legal and competitive risks, and "reviews and monitors the identification, assessment and mitigation of the material risks affecting [Celgene's] operations." The 2016 Proxy thus assured stockholders that the Board was involved with Celgene's business strategy and actively monitored the Company's risk mitigation.  In reality, the Board was utterly failing in its oversight duties; allowing the Company to continue on a business strategy premised on  unlawful  anticompetitive  behavior, ████████████████████████████

████████████████████████████████████

114.    Additionally, the 2016 Proxy highlighted the "strong year" fiscal 2015 was for the Company, noting that revenues increased 21% from the prior year.  The 2016 Proxy noted that

sales of Revlimid generated $5.801 billion, or more than 62% of the Company's revenues for fiscal year 2015.   Defendants Hugin, Alles, Barker, Bonney, Casey, Cox, Fouse, Friedman, Haller, Kaplan, Loughlin, and Mario incorrectly attributed the Company's "superior" operating performance to defendant Alles, stating:   "Mr. Alles has been intimately involved in setting our long-term growth strategy and has contributed significantly to our superior operating performance."   In truth, Celgene's supracompetitive revenues were the result of the Company's unlawful exclusion of competition from the market for its lead products, Revlimid and Thalomid.

115.    The 2016 Proxy harmed Celgene by interfering with the proper governance on its behalf that follows the free and informed exercise of stockholders' right to vote for directors. As a result of the misleading statements in the 2016 Proxy, Celgene's stockholders voted via an uninformed stockholder vote to reelect defendants Hugin, Alles, Barker, Bonney, Casey, Cox, Fouse, Friedman, Haller, Kaplan, Loughlin, and Mario to Celgene's Board.

**2.  Misstatements Made in Support of the Vote to Approve an Amendment to the 2008 Stock Incentive Plan to Increase the Number of Shares Available Under the Plan**

116.    Defendants Hugin, Alles, Barker, Bonney, Casey, Cox, Fouse, Friedman, Haller, Kaplan, Loughlin, and Mario also made misrepresentations in the 2016 Proxy in support of a stockholder vote for approval of an amendment of the Company's 2008 Stock Incentive Plan (the "Incentive Plan") to increase the number of shares available under the plan, among other things. The amendment sought to increase the total number of shares that can be issued under the plan by 17.5 million, from 247.7 million to 265.2 million.   The 2016 Proxy noted the purpose of the Incentive Plan:   "The purpose of the Plan is to enable us and our affiliates to attract, retain and motivate employees and non-employee directors who are important to our success and growth, and to strengthen the mutuality of interests between such individuals and our stockholders by

granting such individuals stock-based incentives and other equity interests in us."  In support of

the requested approval, the 2016 Proxy stated:

> The Board of Directors believes that if the Proposal is approved, we will be able to continue to:
>
> - provide long-term performance incentives to our employees that will benefit our Company and our stockholders;
>
> - build a global inflammation and immunology franchise of world-class talent that supports both our existing products and indications and positions us for future growth with additional indications and products;
>
> - evolve our human capital strategy by hiring thought leaders and innovators in key functions that are critical to our long-term success;
>
> - provide differentiated, meaningful rewards to our top talent and those current employees who provide the greatest value creation for us by granting options and RSUs, and affording these employees the opportunity to earn additional awards based on past performance and expected future contribution; and
>
> - foster our entrepreneurial company philosophy of broad-based employee stock ownership that has helped make us successful.

117.    The annual and long-term compensation awards were subject to performance

goals.   The material terms of the performance goals in Celgene's Incentive Plan did not

encourage proper risk oversight, nor advance long-term stockholder value.   In reality, the

material terms of the performance goals in the Incentive Plan actually encouraged—and

consistently rewarded—extreme risk-taking, which furthered only short-term growth fueled by

artificially inflated sales numbers due to the Company's anticompetitive business practices, while

rewarding executives overseeing such illegal practices.

118.    Particularly, the Incentive Plan incentivized Company fiduciaries to continue the

anticompetitive scheme detailed herein to keep the stock price artificially inflated.   The

Individual Defendants were negligent in not knowing that Company executives had breached

their fiduciary duties to the Company and exposed the Company to significant and material risks and liability through their conduct related to Celgene's unlawful scheme.

119.    As a result of the misleading statements in the 2016 Proxy, Celgene's stockholders voted for the increase in shares for distribution under the Incentive Plan.  This vote was made without the benefit of material information regarding the defendants' continued and ongoing failure to address Celgene's anticompetitive business practices and their failure to reform the Company's incentive compensation structures to ensure they did not promote these unlawful practices.

**B.    The 2017 Proxy Statement**

120.    On April 27, 2017, Celgene issued its Proxy Statement for the 2017 Annual Meeting of Stockholders, held on June 14, 2017 (the "2017 Proxy"). In the 2017 Proxy, defendants Hugin, Alles, Barker, Bonney, Casey, Cox, Fouse, Friedman, Haller, Kaplan, Loughlin, and Mario solicited stockholder votes to, among other things: (i) reelect defendants Hugin, Alles, Barker, Bonney, Casey, Cox, Friedman, Haller, Kaplan, Loughlin, and Mario to the Board; and (ii) approve an amendment to the Incentive Plan.  Defendants Hugin, Alles, Barker, Bonney, Casey, Cox, Fouse, Friedman, Haller, Kaplan, Loughlin, and Mario negligently issued misleading statements with respect to each of these solicited votes.

121.    Plaintiff's allegations with respect to the misleading statements in the 2017 Proxy are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of these defendants, and they do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

1.   **Misstatements Made in Support of Reelecting Defendants Hugin, Alles, Barker, Bonney, Casey, Cox, Friedman, Haller, Kaplan, Loughlin, and Mario**

122.   In the 2017 Proxy, defendants Hugin, Alles, Barker, Bonney, Casey, Cox, Fouse, Friedman, Haller, Kaplan, Loughlin, and Mario solicited stockholder votes to reelect defendants Hugin, Alles, Barker, Bonney, Casey, Cox, Friedman, Haller, Kaplan, Loughlin, and Mario to the Board.   In support of their bid to reelect themselves, these defendants highlighted their supposed successful oversight of the Company.   In particular, the 2017 Proxy described their responsibilities and the duties of each Board committee.   Additionally, the 2017 Proxy incorrectly claimed that the Board was involved with Celgene's business strategy and actively monitored the Company's legal and competitive risks:

**Board of Directors' Role in Risk Oversight**

In connection with its oversight responsibilities, the Board of Directors, including through the Audit Committee, Nominating Committee and Compensation Committee, periodically assesses the significant risks that we face. These risks include financial, legal, technological, competitive, operational and compensation-related risks. The Board, together with the Executive Chairman, the Chief Executive Officer, the Chief Financial Officer, management representatives of the relevant functional areas (*e.g.* internal audit, legal, regulatory and compliance groups, operational management, human resources, *etc.*) and representatives of each of our primary operating subsidiaries, reviews and monitors the identification, assessment and mitigation of the material risks affecting our operations.

123.   Through these statements, defendants Hugin, Alles, Barker, Bonney, Casey, Cox, Fouse, Friedman, Haller, Kaplan, Loughlin, and Mario misleadingly claimed that the Board: (i) maintained sufficient compliance, internal control, disclosure review, and reporting programs to mitigate wrongdoing and apprise the Board of significant risks; (ii) was well informed of the Company's exposure to risk through myriad information channels; and (iii) promoted prudent risk management practices.   In reality, the Board was utterly failing in its oversight duties

allowing the Company to continue on a business strategy premised on unlawful anticompetitive

behavior, ███████████████████████████████████████████

███████████████████████.

124.    Additionally, the 2017 Proxy highlighted the Company's "outstanding financial

performance" and "superior operating performance" for fiscal 2016.  The 2017 Proxy stated:

**2016 Key Performance Highlights**

Led by our executive team, 2016 was another year of exceptional results for our
Company and the patients we serve, as reflected in our outstanding financial
performance, the significant progress of pivotal early-, mid- and late-stage
programs and investments in our long-term growth through acquisitions and
strategic collaborations. We are driven by science and continue to be committed
to patients, making significant investment in research and development and
treating more than 500,000 patients in 2016.

The 2017 Proxy, however, failed to disclose that the Company's superior operating performance

was the result of the Company's unlawful exclusion of competition from the market for its lead

products, Revlimid and Thalomid.

125.    The 2017 Proxy harmed Celgene by interfering with the proper governance on its

behalf that follows the free and informed exercise of stockholders' right to vote for directors. As

a result of the misleading statements in the 2017 Proxy, Celgene's stockholders voted via an

uninformed stockholder vote to reelect defendants Hugin, Alles, Barker, Bonney, Casey, Cox,

Friedman, Haller, Kaplan, Loughlin, and Mario to Celgene's Board.

**2.    Misstatements Made in Support of Vote to Approve an Amendment to
the Incentive Plan to Extend the Plan and Increase the Number of Shares
Available Under the Plan**

126.    Defendants Hugin, Alles, Barker, Bonney, Casey, Cox, Fouse, Friedman, Haller,

Kaplan, Loughlin, and Mario also made misrepresentations in the 2017 Proxy in support of a

stockholder vote for approval of an amendment of the Incentive Plan to extend the plan, increase

the number of shares available under the plan, and increase the maximum individual payment under performance-based cash awards. The amendment sought to extend the term of the Incentive Plan by three years and increase the total number of shares that can be issued under the plan by 10 million, from 265.2 million to 275.2 million. The Board recommended voting for this proposal for substantially the same reasons set forth in the 2016 Proxy.

127. For the reasons detailed *supra* with respect to the 2016 Proxy, the Director Defendants' statements in the 2017 Proxy were materially misleading and caused stockholders to vote in accord with the Board's respective recommendations.

**C.     The 2018 Proxy Statement**

128. On April 30, 2018, Celgene issued its Proxy Statement for the 2018 Annual Meeting of Stockholders, held on June 13, 2018 (the "2018 Proxy"). In the 2018 Proxy, defendants Alles, Barker, Bishop, Bonney, Casey, Cox, Friedman, Haller, Hall, Kaplan, Loughlin, Mario, and Weiland solicited stockholder votes to, among other things, reelect defendants Alles, Barker, Bishop, Bonney, Casey, Cox, Friedman, Haller, Hall, Loughlin, Mario, and Weiland to the Board. Defendants Alles, Barker, Bishop, Bonney, Casey, Cox, Friedman, Haller, Hall, Kaplan, Loughlin, Mario, and Weiland negligently issued misleading statements with respect to each of these solicited votes.

129. Plaintiff's allegations with respect to the misleading statements in the 2018 Proxy are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of these defendants, and they do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

130.    In the 2018 Proxy, defendants Alles, Barker, Bishop, Bonney, Casey, Cox, Friedman, Haller, Hall, Kaplan, Loughlin, Mario, and Weiland solicited stockholder votes to reelect defendants Alles, Barker, Bishop, Bonney, Casey, Cox, Friedman, Haller, Hall, Loughlin, Mario, and Weiland to the Board.  In support of their bid to reelect themselves, these defendants highlighted their supposed successful oversight of the Company.  In particular, the 2018 Proxy described their responsibilities and the duties of each Board committee.  Additionally, the 2018 Proxy incorrectly claimed that the Board was involved with Celgene's business strategy and actively monitored the Company's risk mitigation:

**Board of Directors' Role in Risk Oversight**

In connection with its oversight responsibilities, the Board of Directors, including through the Audit Committee, Nominating Committee and Compensation Committee, periodically assesses the significant risks that we face. These risks include financial, legal, technological, competitive, operational and compensation-related risks. The Board, together with the Executive Chairman, the Chief Executive Officer, the Chief Financial Officer, management representatives of the relevant functional areas (*e.g.* internal audit, legal, regulatory and compliance groups, operational management, human resources, *etc.*) and representatives of each of our primary operating subsidiaries, reviews and monitors the identification, assessment and mitigation of the material risks affecting our operations.

131.    Through these statements, defendants Alles, Barker, Bishop, Bonney, Casey, Cox, Friedman, Haller, Hall, Kaplan, Loughlin, Mario, and Weiland misleadingly claimed that the Board: (i) maintained sufficient compliance, internal control, disclosure review, and reporting programs to mitigate wrongdoing and apprise the Board of significant risks; (ii) was well informed of the Company's exposure to risk through myriad information channels; and (iii) promoted prudent risk management practices.  In reality, the Board was utterly failing in its oversight duties allowing the Company to continue on a business strategy premised on unlawful

anticompetitive behavior, ███████████████████████████████████

██████████████████████████████████

132.    The 2018 Proxy harmed Celgene by interfering with the proper governance on its behalf that follows the free and informed exercise of stockholders' right to vote for directors. As a result of the misleading statements in the 2018 Proxy, Celgene's stockholders voted via an uninformed stockholder vote to reelect defendants Alles, Barker, Bishop, Bonney, Casey, Cox, Friedman, Haller, Hall, Loughlin, Mario, and Weiland to Celgene's Board.

133.    In the absence of the documents produced in response to plaintiff's Section 220 Demand, plaintiff could not have been aware that the statements in the above Proxies were false.

## DAMAGES TO THE COMPANY

134.    The Individual Defendants' improper course of conduct has subjected the Company to potentially hundreds of millions of dollars in damages in connection with the Antitrust Class Action.  The Antitrust Class Action alleged that the Company violated federal antitrust laws by engaging in an anticompetitive scheme which consisted of: (i) using its REMS programs as a pretext to deny generic manufacturers access to samples of Thalomid and Revlimid necessary to complete bioequivalence testing; (ii) fraudulently obtaining various patents, including distribution method patents; (iii) engaging in sham litigation; and (iv) entering into anticompetitive settlement agreements.  In October 2015, the Court in the Antitrust Class Action denied the Company's motion to dismiss.  In doing so, the Court found that plaintiffs raised a plausible inference that "Celgene willfully sought to maintain its monopoly in violation of Section 2 of the Sherman Act in order to charge supracompetitive prices, not through business acumen or a superior product, but through a concerted effort to deny potential generic competitors access to the market."

135.    In addition, at least two of Celgene's competitors have filed private actions against the Company alleging that Celgene unlawfully maintained monopolies over its two "lead" products—Thalomid and Revlimid—by preventing lower-priced generic competition from entering the market.    In the private action brought by Mylan in in the U.S. District Court for the District of New Jersey, Mylan alleged that Celgene used its REMS programs as a pretext to prevent Mylan from acquiring the necessary samples to conduct bioequivalence studies. In December 2014, the Court denied the Company's motion to dismiss based on Section 2 of the Sherman Act and with respect to the statute of limitations for Thalomid.  In doing so, the court noted that "Mylan pled that there is no legitimate business reason for Celgene's actions" and that "Celgene has sold samples of Thalomid and Revlimid at retail and provided it to research organizations, but refuses to sell to Mylan because of its anticompetitive goals."

136.    The Individual Defendants' illegal practices and gross failures to timely address, remedy, or even disclose such practices also severely damaged Celgene's reputation within the business community and in the capital markets.  In addition to price, Celgene's current and potential investors consider a company's ability to curb known abuses and implement adequate controls to ensure illegal practices are timely discovered and properly addressed.  Potential investors are less likely to invest in companies which lack internal controls and engage in widespread illegal practices.

137.    Further, as a direct and proximate result of the Individual Defendants' actions, Celgene has expended, and will continue to expend, significant sums of money.  Such expenditures include, but are not limited to:

(a)    costs incurred in defending against, and the potential settlement of multiple legal proceedings brought against the Company related to anticompetitive conduct;

(b)      costs incurred in filing sham patent lawsuits against a number of generic competitors;

(c)      costs incurred in complying with the investigations by the FTC and Connecticut Attorney General;

(d)      costs incurred in complying with any order by the FTC, including potential costs incurred in establishing an antitrust compliance program, documenting communications with competitors, and monitoring compliance with the order;

(e)      costs incurred from reimbursing customers the Company harmed; and

(f)      costs incurred from compensation and benefits paid to the defendants who have breached their duties to Celgene.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

138.   Plaintiff brings this action derivatively in the right and for the benefit of Celgene to redress injuries suffered, and to be suffered, by the Company as a direct result of breaches of fiduciary duties, waste of corporate assets, and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants.  Celgene is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

139.   Plaintiff will adequately and fairly represent the interests of Celgene in enforcing and prosecuting its rights.

140.   Plaintiff was a stockholder of Celgene at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current Celgene stockholder.

141.   The current Board of Celgene consists of the following twelve individuals: defendants Alles, Barker, Bishop, Bonney, Casey, Cox, Friedman, Haller, Hall, Loughlin, Mario,

and Weiland.  Plaintiff has not made any demand on the present Board to institute this action because such a demand would be a futile, wasteful, and useless act, as set forth below.

**Demand Is Excused Because Defendants Alles, Barker, Bishop, Bonney, Casey, Cox, Friedman, Haller, Hall, Loughlin, Mario, and Weiland Face a Substantial Likelihood of Liability for Their Misconduct**

142.    As alleged above, all of the twelve current Board members violated section 14(a) of the Exchange Act by at least negligently making the misstatements and omissions in the 2016 Proxy, 2017 Proxy, and/or 2018 Proxy (collectively, the "Proxies").  Defendants Alles, Barker, Bishop, Bonney, Casey, Cox, Friedman, Haller, Hall, Loughlin, Mario, and Weiland are responsible for the negligently made statements in the materially misleading Proxies.  It is against public policy to indemnify individuals for violations of section 14(a) of the Exchange Act.  Accordingly, any indemnification provided by the Company to defendants Alles, Barker, Bishop, Bonney, Casey, Cox, Friedman, Haller, Hall, Loughlin, Mario, and Weiland does not protect them for violations of section 14(a) in the Proxies.  As a result, defendants Alles, Barker, Bishop, Bonney, Casey, Cox, Friedman, Haller, Hall, Loughlin, Mario, and Weiland face a substantial likelihood of liability, excusing a demand.

143.    ███████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████  ███████████████

████████████████████████████. Given the supracompetitive prices Celgene was able to charge, and supracompetitive profit margins Celgene was able to reap for over a decade, the Board could not have been unaware that the Company was engaged in unlawful anticompetitive business practices.  In any competitive market, Celgene's supracompetitive prices and profit margins would have invited generic competitors to enter the market, and reduced Celgene's market share.  Celgene, however, was able to maintain exclusivity in the markets for both

Revlimid and Thalomid for more than a decade, despite repeated attempts by generic manufacturers to enter the market.

144.  ███████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████  In 2011 defendants Casey, Cox, Friedman, Loughlin, and Mario each signed the Company's 2010 Form 10-K acknowledging that: (i) the Company had received a CID from the FTC, as well as a subpoena from the State of Connecticut, seeking documents and other information related to requests by manufacturers of generic pharmaceuticals to purchase Revlimid and Thalomid; and (ii) the FTC was investigating whether Celgene engaged in unfair methods of competition.  ██████████████████████████

███████████████████████████████████████████████████

██████████████████████████████

145.  In addition, defendants Loughlin, Cox, Bonney, and Barker, were all well aware that ████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████ ████ █ ████ ████ █ ██████ ███████ █████ █

█████████████████ ████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████   ██████████████████████████████

████████████████████████████████

146.    The principal duty of the Board is to ensure that the Company operates in compliance with all applicable laws and regulations.  As alleged above, each of the twelve current Board members, including Director Defendants Alles, Barker, Bishop, Bonney, Casey, Cox, Friedman, Haller, Hall, Loughlin, Mario, and Weiland face a substantial likelihood of liability for repeatedly failing to comply with these duties.  Accordingly, demand is excused because a majority of the Board faces a substantial likelihood of liability.

147.    Defendants Barker, Bonney, Casey, Cox, Haller, Hall, Loughlin, and Weiland, as members of the Audit Committee during relevant times, were responsible for compliance with accounting, legal, and regulatory requirements.  These defendants breached their fiduciary duties by allowing the unlawful anticompetitive business practices to continue despite several lawsuits and governmental investigations pending, putting them, at a minimum, on notice of the illegal activity.  Thus, the Audit Committee Defendants face a substantial likelihood of liability for their breach of fiduciary duties, making any demand upon them futile.

148.    Defendants Bonney, Casey, Friedman, and Mario, as members of the Compliance Committee were responsible for "[o]verseeing the periodic evaluation of the performance of the Board and its committees," "[d]eveloping and recommending to the Board such corporate governance guidelines, including changes to such guidelines that the Committee deems appropriate," and "[o]verseeing the Company's corporate compliance efforts."  In allowing the anticompetitive practices to continue at Celgene for a number of years, defendants Bonney,

Casey, Friedman, and Mario breached their fiduciary duties.

149.    Plaintiff has not made any demand on the other stockholders of Celgene to institute this action since such demand would be a futile and useless act for at least the following reasons:

(a)    Celgene is a publicly held company with over 700 million shares outstanding and thousands of stockholders;

(b)    making a demand on such a large number of stockholders would be impossible for plaintiff, who has no way of finding out the names, addresses, or phone numbers of stockholders; and

(c)    making a demand on all stockholders would force plaintiff to incur excessive expenses, assuming all stockholders could be individually identified.

## COUNT I

**Against the Director Defendants for Violation of Section 14(a) of the Exchange Act**

150.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

151.    The section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Director Defendants. The section 14(a) Exchange Act claims alleged herein do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegation of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to the nonfraud claims.

152.    The Director Defendants negligently issued, caused to be issued, and participated in the issuance of materially misleading written statements to stockholders which were contained

in the Proxies. In the Proxies, the Board solicited stockholder votes to reelect themselves to the Board and approve the amendments to the Incentive Plan.  The Proxies, however, misrepresented and failed to disclose Celgene's illegal anticompetitive business practices and the Company's inadequate internal controls which facilitated the illegal behavior detailed herein.  By reasons of the conduct alleged herein, the Director Defendants violated section 14(a) of the Exchange Act. As a direct and proximate result of these defendants' wrongful conduct, Celgene misled and/or deceived its stockholders by making misleading statements that were essential links in stockholders heeding Celgene's recommendation to reelect certain Board members and approve the amendments to the Incentive Plan.

153.    The misleading information contained in the Proxies was material to Celgene's stockholders in determining whether or not to elect these defendants and approve the amendments to the Incentive Plan. This information was also material to the integrity of the directors that were proposed for election to the Board. The proxy solicitation process in connection with the Proxies were essential links in the reelection of nominees to the Board and the approval of the Incentive Plan.

154.    Plaintiff, on behalf of Celgene, thereby seeks relief for damages inflicted upon the Company based upon the misleading Proxies in connection with the improper reelection of the members of the Board and approval of the amendments to the Incentive Plan.

## COUNT II

### Against the Individual Defendants for Breach of Fiduciary Duty

155.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

156.   As alleged in detail herein, the Individual Defendants, by reason of their positions as officers and directors of Celgene and because of their ability to control the business and corporate affairs of Celgene, owed the Company fiduciary obligations of due care and loyalty, and were and are required to use their utmost ability to control and manage Celgene in a fair, just, honest, and equitable manner.

157.   Each of the Individual Defendants violated their fiduciary duties by failing to act to stop the culture of lawlessness within Celgene.   The Individual Defendants repeatedly encouraged and/or acquiesced to unlawful and unethical behavior throughout the Company's business operations.

158.   This culture of lawlessness was directly responsible for the Company's repeated violations of the law as detailed herein.   In particular, as a result of the Officer Defendants' violations of their duties of loyalty and care, and the Director Defendants' violations of their duty of loyalty, for several years the Company: (i) engaged in the illegal anticompetitive practices detailed herein; (ii) failed to take appropriate action to curb the widespread abuses; (iii) represented that the Board and the Company maintained sufficient internal controls to timely recognize and address wrongdoing; and (iv) failed to timely disclose the Company's highly material and widespread illegal actions to the investing public.

159.   As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Celgene has sustained significant damages as alleged herein.   As a result of the misconduct alleged herein these defendants are liable to the Company.

160.   Plaintiff, on behalf of Celgene, has no adequate remedy at law.

## COUNT III

### Against the Individual Defendants for Waste of Corporate Assets

161.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

162.     As a result of the illegal business practices detailed herein, the Individual Defendants have caused Celgene to incur substantial costs.

163.     In addition, as a result of the wrongdoing complained of herein, the Company is forced to defend itself in a number of lawsuits.  Specifically, the Company's anticompetitive activity has spawned a private action by one of Celgene's competitors as well as the Antitrust Class Action.  The Individual Defendants have caused Celgene to waste its assets by forcing it to defend itself in the ongoing litigation, in addition to any ensuing costs from a potential settlement or adverse judgment.

164.     Finally, the Individual Defendants have caused Celgene to waste its assets by paying improper compensation and bonuses to certain of its executive officers and directors that breached their fiduciary duties.

165.     As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

166.     Plaintiff, on behalf of Celgene, has no adequate remedy at law.

## COUNT IV

### Against the Individual Defendants for Unjust Enrichment

167.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

168.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Celgene.  The Individual Defendants were unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to Celgene.

169.    Plaintiff, as a stockholder and representative of Celgene, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

170.    Plaintiff, on behalf of Celgene, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff, on behalf of Celgene, demands judgment as follows:

A.    Against all of the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants' breaches of fiduciary duties, waste of corporate assets, and unjust enrichment;

B.    Directing Celgene to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Celgene and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote, resolutions for amendments to the Company's Bylaws or Articles of Incorporation and taking such other action as may be necessary to place before stockholders for a vote of the following Corporate Governance Policies:

1.    a proposal to strengthen Board oversight and supervision of Celgene's business practices, particularly with respect to anticompetitive conduct;

2.      a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater stockholder input into the policies and guidelines of the Board; and

3.      a provision to permit the stockholders of Celgene to nominate at least three candidates for election to the Board;

C.      Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiff on behalf of Celgene has an effective remedy;

D.      Awarding to Celgene restitution from defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the defendants;

E.      Awarding to plaintiff the costs and disbursements of the action, including reasonable attorney's fees, accountants' and experts' fees, costs, and expenses; and

F.      Granting such other and further relief as the Court deems just and proper.

## <u>JURY DEMAND</u>

Plaintiff demands a trial by jury.

Dated: October __, 2018                     **COOCH AND TAYLOR, P.A.**

*/s/ Blake A. Bennett*
BLAKE A. BENNETT (#5133)
The Brandywine Building
1000 West Street, 10th Floor
P.O. Box 1680
Wilmington, DE  19899-1680
(302) 984-3889

*Attorneys for Plaintiff*

*Of Counsel:*

ROBBINS ARROYO LLP
BRIAN J. ROBBINS
CRAIG W. SMITH
STEVEN R. WEDEKING
600 B Street, Suite 1900
San Diego, CA 92101
Telephone: (619) 525-3990
Facsimile: (619) 525-3991
E-mail:  brobbins@robbinsarroyo.com
          csmith@robbinsarroyo.com
          swedeking@robbinsarroyo.com

1298236